**HONIK LLC**
Ruben Honik (*Pro hac vice application to be filed*)
ruben@honiklaw.com
David J. Stanoch (*Pro hac vice application to be filed*)
david@honiklaw.com
1515 Market St., Suite 1100
Philadelphia, PA 19102
Telephone: 267-435-1300

**MORITT HOCK & HAMROFF LLP**
Daniel Lust (*Pro hac vice application to be filed*)
dlust@moritthock.com
Lauren Bernstein (*Pro hac vice application to be filed*)
lbernstein@moritthock.com
400 Garden City Plaza
Garden City, NY 11530
Telephone: 516-873-2000

**FARNESE P.C.**
Peter J. Farnese (SBN 251204)
pjf@farneselaw.com
2555 Townsgate Road, Suite 200
Westlake Village, California 91361
Telephone: 310-356-4668
Facsimile: 310-388-1232

Attorneys for Plaintiff and the Proposed Class

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BENJAMIN PEARCE, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>Defendants. | Case No. '26CV4734 WQHDDL<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff BENJAMIN PEARCE ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, brings this class action against Defendants NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ("NCAA" or "Defendant"), and alleges the following based upon his personal knowledge as to his own acts and experiences, and upon information and belief, including the investigation of his counsel, as to all other matters.

## CONCISE INTRODUCTION

1. This class action seeks urgent injunctive and related relief on behalf of a very discrete group of collegiate student-athletes: Division II and Division III student-athletes who graduated high school in 2022, and are currently in the NCAA's Transfer Portal looking to transfer to a Division I school at which to compete in a fifth year of collegiate athletic eligibility (the proposed "Class").

2. The Class will suffer immediate, irreparable harm as a result of the NCAA's unlawful enforcement of an aged-based eligibility rule implemented on June 24, 2026, the NCAA's Division I Five-Year Eligibility Rule.

3. This new rule establishes a five-year period of eligibility tied directly, and exclusively, to a student-athlete's age and year of initial college enrollment.

4. The NCAA has applied the Rule to prohibit Plaintiff and the Class from playing at a Division I school simply because they graduated high school in 2022 and have already competed for four years. The NCAA has done this even though all other student-athletes, both younger and older than the Class, may compete for five years under the Rule.

5. Thus, the NCAA has placed Plaintiff, and the hundreds (if not thousands) of similarly situated student-athletes in a distinct limbo status, unable to transfer to a Division I school despite properly entering the NCAA's Transfer Portal. This constitutes an unlawful restraint of trade under Section 1 of the Sherman Act.

## NATURE OF THE ACTION

6. The NCAA has arbitrarily, unfairly, and anticompetitively applied its Five-Year Eligibility Rule to foreclose Plaintiff and the Class from transferring to, and playing a fifth year with, a Division I school.

7. The Five-Year Eligibility Rule essentially provides that nearly all eligible student-athletes may compete for five seasons in five years in Division I. For example, a student-athlete who graduated high school in 2023 can compete in Division I for five seasons in five years.

8. The NCAA has inexplicably targeted Plaintiff and the Class for unequal treatment under the Five-Year Rule. Per the NCAA, student-athletes who graduated high school in 2022, and who have already completed four years of collegiate competition, are *excluded* from transferring to and competing with a Division I school for a fifth year.

9. Many student-athletes structured their collegiate athletic career on climbing the ladder for four years, to best-position themselves for a potential fifth year with a Division I school.

10. Transferring to a Division I school for a fifth year of competition has many obvious personal and commercial benefits for student-athletes. Aside from the academic and reputational benefits of playing for a reputable school in the NCAA's marquee division, Division I student-athletes typically (i) receive greater and more lucrative scholarships, (ii) earn more Name, Image and Likeness ("NIL") compensation, and (iii) garner greater post-collegiate offers, opportunities, and salaries.

11. The foregoing benefits and opportunities are contingent on a student-athlete being able to transfer to a Division I school. The NCAA's foreclosing these benefits to student-athletes who happened to graduate high school in 2022 robs them of these benefits and opportunities.

12. Take Plaintiff Pearce for example. After graduating high school in 2022, he has played four seasons of Division III basketball for Emory University. He achieved considerable success for his team, his school, and himself, such as by attaining multiple

statistical records at Emory, and being named Division III National Player of the Year in March 2026.

13. Plaintiff Pearce's hard work and success engendered significant interest in him as a player. He entered the NCAA's Transfer Portal, which is the only way under NCAA rules that a student-athlete can transfer from a Division II or Division III school to a Division I school.

14. Multiple Division I schools expressed interest in Plaintiff Pearce's transferring so he can play basketball for them in what should be his fifth year of collegiate eligibility were he to transfer to a Division I school. One such Division I school located in this District extended an invitation of interest to Plaintiff.

15. Were Plaintiff to transfer to a Division I school, he would be eligible for additional scholarships, greater NIL earning potential, and an enhanced post-collegiate salary.

16. None of that is now possible for Plaintiff. The NCAA has arbitrarily decided that student-athletes who graduated high school in 2022, like Plaintiff Pearce, can no longer compete at a Division I school if they already competed collegiately for four years. He also is not able to return to Emory for a fifth year under NCAA's rules.

17. The NCAA's conduct constitutes an unreasonable restraint of trade under Section 1 of the Sherman Act.

18. Indeed, just a couple of weeks ago, another district court enjoined the NCAA from enforcing its Five-Year Eligibility Rule as to a class of existing Division I student-athletes who had already completed four years of play and wished to play a fifth year at a Division I school. *See Wisne v. NCAA*, No. 1:26-cv-03063 (D. Colo. July 31, 2026) (ECF 38), *clarified*, Aug. 2, 2026 (ECF 41). That ruling is currently on appeal to the United States Court of Appeals for the Tenth Circuit.

19. The *Wisne* class only included student-athletes *already* competed at a Division I school and wanted to compete a fifth year. It did not include the Class here,

*viz.*, student-athletes at Division II or Division III schools in the Transfer Portal looking to transfer to a Division I school for what would be a fifth year of collegiate competition.

20. The same reasoning in *Wisne* applies with equal force here.

21. NCAA's coercive use of its monopsony power is even more evident here than it was in *Wisne*. Just a few days *after* the *Wisne* court issued its injunction as to the Five-Year Eligibility Rule, the NCAA boldly implemented a substantively identical rule for Division II.

22. Accordingly, Plaintiff, on behalf of the Class, seeks damages and injunctive relief on behalf of themselves and all other situated persons in the United States whose rights are implicated by the Five-Year Eligibility Rule and who are not part of the *Wisne* class.

## THE PARTIES

23. Plaintiff is Benjamin Pearce is men's basketball guard who competed in the University Athletic Association ("UAA"), an intercollegiate athletic conference in NCCA Division III, for Emory University. Pearce is Emory's all-time career leader in total points (2,080), scoring average (18.9), three-pointers made (260), games started (110), and minutes played (3,679).[1] He established new single season team records in points scored (697), scoring average (24.0), free throws made (172), minutes played (1,081), and is only the second player ever to reach 200 assists in a season with his Division III-leading total (207).[2] In March 2026, for the 2025-2026 NCAA Division III men's basketball season, Pearce was honored by being named the D3hoops.com National Player of the Year.[3]

---

[1] https://emoryathletics.com/sports/mens-basketball/roster/ben-pearce/10277.

[2] https://uaasports.info/news/2026/3/24/mens-basketball-ben-pearce-named-d3hoops-com-national-player-of-the-year-joined-as-all-america-selection-by-jair-knight.aspx.

[3] https://emoryathletics.com/news/2026/3/24/mens-basketball-pearce-knight-headline-d3hoops-com-all-america-teams-pearce-labeled-national-player-of-the-year.aspx.

24. Defendant National Collegiate Athletic Association holds itself out as an unincorporated non-profit education organization. Its principal place of business is in Indianapolis, IN.

25. The NCAA is the governing body of college sports with approximately 1,100 member colleges and universities throughout the United States, including institutions in this District. It is a member-controlled organization that claims it exists to regulate college sports and protect college athletes. The NCAA's Mission and Priorities state that the organization is "guided by its commitment to college athlete well-being, fair and inclusive competition, and opportunities for academic and athletics success across all divisions."[4] The NCAA's Constitution Principles further articulate a purported dedication to "The Primacy of Academic Experience," "The Collegiate Student-Athlete Model," and "Student-Athlete Wellbeing."[5] But despite that stated mission, the NCAA oversees a massive commercial enterprise that generates billions of dollars from the labor and performance of college athletes.

26. There are 1,086 active NCAA member schools, and these schools are organized into three Divisions. Division I includes 366 schools, including 265 with major football programs. These are the best-known schools in the country. Divisions II and III include schools with less extensive athletic programs, more limited or localized competition, lower or no athletic scholarship offerings, and reduced athletic budgets. As a practical matter, any academic institution that wishes to participate in any meaningful way in the highest and most popular levels of college sports must maintain membership in the NCAA and abide by the Division I rules and regulations promulgated by the NCAA and its members.

---

[4] NCAA Mission and Priorities, NCAA, https://www.ncaa.org/about-us/mission-and-priorities/.

[5] NCAA Constitution Principles, NCAA, https://www.ncaa.org/about-us/mission-and-priorities/constitution-principles/. Note that the term "student-athlete" is a construct used by the NCAA as a means to obfuscate the labor of college athletes and is disfavored by those who actually play.

27. As the NCAA acknowledged in *NCAA v. Alston*, 594 U.S. 69, 90 (2021), its member schools collectively enjoy a monopoly in the market for college athlete services, such that its restraints can and do harm competition. With such power, the NCAA has grown into what one court has described as a "financial behemoth," with "revenues often exceeding $1 billion annually." *Johnson v. NCAA*, 108 F.4th 163, 170 (3d Cir. 2024).

28. Through the NCAA Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports. The Constitution and Bylaws were adopted by votes of the member institutions (though often only select subsets of such institutions) and may be amended by votes of the member institutions (or select subsets thereof). The NCAA is responsible for the passing, implementation, and enforcement of the Five-Year Eligibility Rule. Beyond including college athlete members chosen not by their college-athlete peers, but by the NCAA and/or member institutions and affiliates on certain NCAA committees, there is no involvement of, or formal NCAA process for soliciting input from, or considering the input of, athletes in formulating rules such as the Five-Year Eligibility Rule.

29. The NCAA generates billions of dollars largely because of the massive commercial success of Division I men's and women's basketball, FCS (lower Division I) football, and other NCAA championship sports. Together, Division I college sports rank among the most profitable entertainment products in the country- outstripping sports as venerable and as much a part of the national firmament as Major League Baseball. Only, the NFL surpasses the collegiate sports enterprise in annual revenue. In the 2024–2025 season alone, the NCAA, itself, reported approximately $1.56 billion in revenue, driven overwhelmingly by the talent, labor, and marketability of college athletes. Yet despite creating that value, athletes have long been restricted by NCAA rules from sharing fairly in the economic success they help produce.

30. In its Consolidated Financial Statements for the fiscal year ending August 31, 2025, the NCAA reported total revenues of $1,566,533,639.[6] The vast majority of that money came from Television and Marketing Rights Fees for the March Madness men's basketball tournament, which brought in revenues of $1,121,881,244 – over one billion dollars to broadcast and market these collegiate competitors.[7]

31. Co-conspirators, while not named as defendants, facilitate the NCAA's illegal conduct in promulgating and enforcing the Five-Year Eligibility Rule. They include Division I conferences and member institutions, and representatives of member institutions and conferences that serve on NCAA Division I committees responsible for promulgating the rule change.

## JURISDICTION AND VENUE

32. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), as this action arises under the Sherman Act, 15 U.S.C. §§ 1 and 2. Jurisdiction also exists under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

33. The Court also has jurisdiction over this matter under 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some of the members of the proposed classes are citizens of a state different from the Defendant.

34. This Court has general personal jurisdiction over Defendant because NCAA's contacts in this District are systematic and continuous. Furthermore, specific personal jurisdiction exists because this action arises out of or relates to the NCAA's purposeful contacts or activities in or directed to California, and NCAA's anticompetitive conduct specifically relates to or arises out of the impact of that conduct on Plaintiff's

[6] NCAA Consolidated Financial Statements August 31, 2025, https://ncaaorg.s3.amazonaws.com/ncaa/finance/2024-25NCAAFIN_FinancialStatement.pdf

[7] *Id.*

ability to receive and accept an offer of interest to compete at a Division I school located in this District.

35. Venue is proper in this District because at least some of the class's claims alleged in this action accrued in this District, Plaintiff's claims accrued at least in part in this District, and Defendant regularly transacts its affairs in this District.

## FACTUAL ALLEGATIONS

36. It is a well-trod path discussing the NCAA's anticompetitive effects. The antitrust violations alleged in this Complaint, while aimed at Division II and Division III student-athletes, primarily occur in Division I athletics. Division I athletics alone covers more than 360 NCAA member institutions, 6,000 teams, and 190,000 NCAA athletes. Division I generates more than a billion dollars in revenue every year, including nearly $1.5 billion in revenue in the 2022-23 school year. While it is hard to quantify exactly how much money is being paid for NIL, the NCAA recently agreed to pay $2.8 billion in "back pay" damages to Division I athletes who participated in college athletics between 2016 and 2024.

37. The NCAA regulates the market for college athletic labor by promulgating rules to which all of its member institutions are expected to adhere. These rules, as laid out in the NCAA Constitution, Bylaws, and Division I Manual, specify to a high degree whether and how student athletes are allowed to participate in Division I. And, as Justice Brett Kavanaugh noted in his concurrence in *Alston*, "the NCAA's remaining compensation rules also raise serious questions under the antitrust laws." 594 U.S. at 108.

38. Every rule put forth by the NCAA indicates an agreement among the NCAA and its member institution to restrict the market for Division I athletic labor, having direct implications for the ability of hundreds of thousands of athletes to receive compensation for the skill and effort they put in which generates billions of dollars in revenue.

39. The relevant geographic market is as broad as the United States. NCAA member institutions exist in all 50 states and multiple territories, and the Class may accept opportunities in each of the 50 states, when recruited.

**A. The NCAA Rules**

40. NCAA Bylaw 12.6 lays out the D-I Five-Year Eligibility Rule. It states:

> 12.6 Five-Year Period of Eligibility. An individual's period of eligibility for practice and competition shall be limited to Five-Years. An individual's five- year period of eligibility begins with the earlier of the following: (Revised: 7/31/14, 6/6/25 effective 7/1/25, 6/24/26 effective 8/1/26)
>
> (a) The regular academic term (semester or quarter) of an academic year in which the individual enrolls in a collegiate institution (domestic or foreign; see Bylaw 14.02.4) in a minimum full-time program of studies and attends a class in that term while enrolled full time; or
>
> (b) The beginning of the regular academic year immediately after the individual's 19th birthday.
>
> …
>
> 12.6.6 Service Exceptions to the Five-Year Period of Eligibility. Time spent in the armed services, on official religious missions or with recognized foreign aid services of the U.S. government is excepted from the application of the five-year period of eligibility. Among such services that qualify for an exception are: (Revised: 4/2/10, 7/31/14, 6/6/25 effective 7/1/25, 6/24/26 effective 8/1/26)
>
> (a) Military Sea Transport Service;
>
> (b) Peace Corps; or
>
> (c) Service as a conscientious objector ordered by the Selective Service Commission (or the equivalent authority in a foreign nation) in lieu of active military duty.
>
> 12.6.6.1 Elapsed Time/Service to Enrollment. If a [college] athlete enrolls in a regular term of a collegiate institution at the first opportunity following completion of one of the service exceptions, the elapsed time (the exact number of calendar days) between completion of the service and the first opportunity for enrollment may be added to the exact number of days served on active duty in the armed services, with foreign aid services or on official religious missions and will not count toward the [college] athlete's Five-Years of eligibility. It is not permissible to extend the five-year period by any additional time beyond the first opportunity to enroll (the opening day of classes of the first regular term at the institution in which the [college] athlete enrolls as a regular student immediately following the termination of the active-duty commitment). (Revised: 4/2/10, 7/31/14, 6/6/25 effective 7/1/25, 6/24/26 effective 8/1/26)
>
> …
>
> (Adopted: 6/24/26 effective 8/1/26)

41. On August 5, 2026, the NCAA adopted a rule that "mirrors" the Rule set forth above, but for Division II.

42. The NCAA also currently has a proposal to adopt a substantively identical rule for Division III as well.

43. The NCAA does not explain why it has decided to allow certain exceptions to the Five-Year Period of Eligibility but not others—it had previously allowed many different types. The NCAA retains all decision-making authority as to whether an exception shall apply to a student-athlete.

44. The NCAA abuses its market power to ensure student-athletes and colleges are afraid to challenge their regulations in court.

45. The first, known as the "Rule of Restitution," NCAA Bylaw 12.9.4.2 is a regulation stating that "if a [college] athlete who is ineligible under the terms of the bylaws or other [NCAA] legislation is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative … and said injunction is voluntary vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified," the NCAA may take actions that punish the institution. In other words, the Rule of Restitution allows the NCAA to retroactively punish an athlete, their coaches, teammates and opponents, and their institution if a court-ordered injunction is later overturned on appeal. That punishment can be severe.

46. The second is a newly adopted anticompetitive ban on what the NCAA calls "Ghost Transfers," codified in Division I Manual Rule 13.1.1.4.9, where the NCAA will both suspend a team's head coach for half a season and fine the college's budget for the sport 20% if they deem that a player "transferred" to the team outside of the player transfer portal. While it is a clear restraint on the market for student athlete services, the severe penalties in place ensure that players are unable to have colleges compete for their services outside of the express structures controlled by the NCAA.

**B. The NCAA's Arbitrary Implementation of the New Five-Year Eligibility Rule Harms Competition and Injures the Class**

47. The NCAA's conduct has harmed Plaintiff and the Class by creating an irrational rule with only arbitrary exceptions, a rule designed with seemingly little consideration of issues that have regularly occurred in the past and that can be easily foreseen as likely to recur in the future. The Five-Year Eligibility Rule extends a valuable benefit to one group of athletes—those who, through waiver or fortunate timing will receive the benefit of playing for five total years—while foreclosing that benefit to Plaintiff and the Class, who through no fault of their own were deemed eligible for four seasons but now, per the NCAA, cannot play a fifth, even if they would like to remain in school.

48. There are many student-athletes in this cohort, including Plaintiff. Most obviously, many student-athletes are excluded from the benefit of the new rule simply because they came to college at the wrong time. Athletes who came to college in 2022, as part of the four-year class that would graduate in 2026, are the only ones of their cohort who are limited by the NCAA to four years of competition. Athletes who came to college in 2021 and graduated in 2025 received an extra "Covid" season, and those who came to college in 2023 and will graduate in 2027 receive the benefits of the new five-year rule.

49. There are also student-athletes who will foreseeably be prevented from the benefit of a fifth year of competition because of circumstances outside of their control. These include athletes whose five-year eligibility is interrupted for sports-related reasons (like those who need to take time off from college to train or participate in Olympic and international competition); those who lose a season to injury; those who are mistreated or abused by coaches to the point that they cannot play or must transfer; those who are victimized by roster manipulation or losing playtime to force a transfer; or those who lose eligibility due to administrative factors beyond their control such as compliance errors, bad institutional advice, or other school or coach misconduct. All will lose seasons of

competition and athletic performance alongside academic opportunity, as a result of the new Five-Year Eligibility Rule.

50. The new rule's arbitrary and discriminatory implementation will harm student-athletes who need to transfer but cannot timely and freely access the Transfer Portal (for example, athletes at service academies who decide to resign and pursue their degrees at civilian institutions). Their eligibility clock will keep running, but due to the interplay between the new NCAA rule imposing draconian budgetary and coach discipline penalties for accepting Ghost Transfers and the Five-Year Eligibility Rule, such athletes will be forced to sit out a season of competition (and will likely suffer loss of conditioning and personal development at the same time) and only be able to compete for four seasons rather than their peers' five seasons.

51. Finally, student-athletes who lose a season because of events completely outside their control, such as a school closure, post-portal program shutdown or mid-season program cancellation, university bankruptcy, natural disaster confined to a single region, or conference disruption will also be harmed by the inflexibility of the Five-Year Eligibility Rule. Under the current procedure, waivers to help athletes achieve their athletic and academic objectives could at least be sought—but here the arbitrary new rules will make relief unattainable.

52. To the extent relevant to the antitrust claims asserted herein, the NCAA's practices are not reasonably necessary to achieve any cognizable procompetitive or legitimate business justification. There is no inherent difference between Plaintiff and the Class, on the one hand, and their colleagues who receive the largesse of five years under the Rule on the other hand, other than they completed four years of eligibility straight in a row. Their talent, age, size, experience, susceptibility to cause or suffer injury, or any other metric is indistinguishable from their peers who received the extra year. When examined in the broader context, where the NCAA is fine with its athletes going forward receiving five years of eligibility, but not those who fall into the class, there is no

justification to deny Plaintiff and the Class the opportunity to compete for one additional year.

**C. The *Wisne* Decision**

53. On July 8, 2026, a group of plaintiffs filed a class action lawsuit against the NCAA in the District of Colorado, styled *Wisne, et al. v. NCAA*, No. 1:26-cv-03063 (D. Colo.).

54. The *Wisne* plaintiffs sought the same that Plaintiff seeks here. Except, the *Wisne* plaintiffs sought to enjoin to NCAA from enforcing the Five-Year Eligibility Rule as to student-athletes who were already competed for four years at a Division I school and wished to compete a fifth year at a Division I school. Their proposed class did *not* include the student-athletes that Plaintiff seeks to represent here, *viz.*, Division II or Division III student-athletes in the Transfer Portal looking to transfer to a Division I school, and play what would be their fifth year of competition at that new school.

55. On July 31, 2026, the *Wisne* court certified the *Wisne* class under Federal Rule of Civil Procedure 23(b)(2). *See* 1:26-cv-03063 (D. Colo.), at ECF 37.[8] The same day, the *Wisne* court issued a detailed 50-page opinion and order enjoining the NCAA from enforcing the Five-Year Eligibility Rule against the *Wisne* class. *Id.*at ECF 38, *clarified* at ECF 41.

56. Among other things, the *Wisne* court found that it had personal jurisdiction over the NCAA (ECF 38 at 8-14); that the plaintiffs had a likelihood of success on the merits (*id.* at 18); that NCAA eligibility rules are commercial restraints for Section 1 purposes (*id.* at 18-20); that the plaintiffs adequately demonstrated a relevant antitrust labor market for Division I college athletes in the United States (*id.* at 21-33); that the NCAA's conduct had a substantial, anticompetitive effect that was not outweighed by

---

[8] The class was defined as: "All persons in the United States who began to play in collegiate sports in the 2022-2023 season, competed in NCAA Division I sports, and completed four years of eligibility as defined by the NCAA's prior rules by the conclusion of the 2025-2026 season, and are therefore barred from playing a fifth season due to the NCAA's adoption and immediate implementation of the Five-Year Eligibility Rule."

purported competitive benefits (id. at 33-41); that less restrictive means existed to achieve the NCAA's purported competitive benefit (*id.* at 41-44); that the class would suffer irreparable harm (*id.* at 45-47); and that the balance of equities and the public interest favored plaintiffs and the class (*id.* at 47-50). A few days later, on August 3, 2026, the court clarified its ruling "lest the result of the order be construed," continuing that "the Court reiterates that the NCAA is enjoined from prohibiting plaintiffs from competing in a fifth season of collegiate athletics under the Rule (as defined in the preliminary injunction order) or any NCAA Bylaw." 1:26-cv-03063 (D. Colo.), at ECF 41.

57. The NCAA appealed the district court's decisions on August 2, 2026 (*id.* at ECF 42), and sought a stay of the injunction (*id.* at ECF 43). The district court denied NCAA's requested stay on August 10, 2026 (*id.* at ECF 56). Expedited briefing is currently underway in the Tenth Circuit.

58. This case addresses the gap left unaddressed in *Wisne*, namely, student-athletes who are *not yet* at a Division I school, but who are in the Transfer Portal looking to transfer to a Division School. By barring the Class from transferring to a Division I school for a fifth year, the NCAA has unilaterally extinguished the only way for Plaintiff and the Class to access the benefits, opportunities, scholastics, and monetary accolades attendant with Division I play.

**D. Division II and Division III Student-Athletes, and the Transfer Portal**

59. The NCAA's "Transfer Portal" is the NCAA's centralized database where student-athletes who intend to transfer are listed. It covers all three NCAA divisions—Division I, Division II, and Division III.

60. Student-athletes must request that their existing school enter them into the portal. Once in the Transfer Portal, student-athletes are eligible to transfer to another NCAA institution, and to compete with that institution's athletics teams.

61. The Transfer Portal is the only way a student-athlete at a Division II or Division III school can transfer to, and compete with a Division I school.

62. Transferring to a Division I school is a highly coveted and fiercely competitive undertaking due to the athletic, scholastic, and monetary implications of competing for a Division I school. It is well-publicized that many Division I schools heavily rely on the Transfer Portal to identify and recruit student-athletes from Division II or Division III schools.

63. The NCAA imposes very particular requirements for student-athletes to enter the Transfer Portal and transfer via the portal.

64. By arbitrarily applying the Five-Year Eligibility Rule to Plaintiff and the Class, the NCAA has foreclosed this discrete group's ability to transfer to a Division I school.

**E. Plaintiff Pearce's Experience**

65. Plaintiff Pearce's experience and the irreparable harm he stands to suffer are indicative of those for the Class as a whole.

66. As noted *supra*, Plaintiff graduated high school in the spring of 2022, and began at Emory University in the fall of 2022. Plaintiff Pearce's dedication, ability, work ethic, and acumen helped him attain numerous all-time career-high statistics at Emory in multiple categories. He was honored to be chosen as the D3hoops.com National Player of the Year from among all active Division III basketball players for the 2025-2026 season.

67. Plaintiff Pearce should be eligible to play for a fifth year of collegiate basketball. Indeed, he viewed doing so as the capstone of his collegiate athletic year, and an opportunity to open doors to potential professional basketball teams in the United States and Europe.

68. Plaintiff Pearce's strong skills and performance did not go unnoticed. Multiple schools contacted Plaintiff Pearce about his transferring and playing for them in his fifth year. Among these schools were Division I schools in this District and elsewhere, and which have extended invitations of interest to Plaintiff Pearce.

69. There is little doubt that playing for a Division I school would be an amazing opportunity for Plaintiff Pearce, or for any student-athlete for that matter. Division I

competition is the pinnacle collegiate athletics, and tend to offer more lucrative grants, scholarships, and post-collegiate prospects.

70. The data bear this out. Division I sports generate more revenue and have much higher attendance numbers than any other divisional, associational, or professional counterpart. Simply put, as a matter of commercial realities, Division I sports stand apart.

71. The notoriety and fierce competition of Division I sports opens doors for post-collegiate endeavors as well. Statistically speaking, post-college, Division I athletes, e.g., enjoy many more professional opportunities, earn higher wages, and have higher NIL and other collateral earning potential than their Division II, Division III, or other collegiate-level athletic peers.

72. As only one example, Plaintiff Pearce currently has an offer to play for a professional basketball team in Europe. The starting salary would be approximately $25,000. Were he to play a fifth year at a Division I school, that accolade alone would see his starting salary balloon to an average of $100,000 to $125,000. By arbitrarily foreclosing Plaintiff Pearce—the Division III Player of the Year—from transferring to and playing for a Division I school, the NCAA is artificially depressing his future earning potential.

73. Plaintiff Pearce, like the rest of the Class, is now in limbo. He properly entered the Transfer Portal; he garnered interest from Division I schools; he was extended invitations of interest to play a fifth year at Division I schools; and the NCAA, without reason or justification, pulled the rug out from under him (and others).

## CLASS ALLEGATIONS

74. Plaintiff brings this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), on behalf of the following Class:

> All persons in the United States who began to play in collegiate sports in the 2022–2023 season, competed in NCAA Division II or Division III sports, completed four years of eligibility as defined by the NCAA's prior rules by the conclusion of the 2025–2026 season, and are in the NCAA's Transfer Portal, and are therefore barred from transferring to a Division I School at which to compete for a fifth season due to the

NCAA's adoption and implementation of the Five-Year Eligibility Rule.

75. Excluded from the Class are governmental entities, Defendant, Defendant's affiliates, parents, subsidiaries, employees, officers, directors, and co-conspirators. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

76. Plaintiff reserves the right to modify or expand the definition of the Class to seek recovery on behalf of additional persons as warranted as facts are learned in further investigation and discovery.

77. Numerosity (Rule 23(a)(1)). The members of the Class are so numerous that joinder of all members is impracticable. The precise number of Class members and their identities are unknown to Plaintiff at this time but will be determined through discovery of Defendant's records. Hundreds, if not thousands, of Division II and Division III student-athletes are currently in the NCAA Transfer Portal. Class members may be notified of the pendency of this action by mail, email, and/or publication.

78. Commonality and Predominance (Rules 23(a)(2), 23(b)(3)). Common questions of law and fact exist as to all Class members and predominate over any questions affecting only individual members, including:

a. Whether Defendant violated the antitrust laws;

b. Whether Defendant engaged in anticompetitive conduct;

c. Whether Defendant engages in interstate commerce;

d. Whether Plaintiff and the Class were harmed and suffered antitrust injury as result of Defendant's conduct;

e. Whether Plaintiff and the Class are entitled to injunctive and declaratory relief, and the nature of same; and

f. Whether Plaintiff and the Class are entitled to damages, and the nature and extent of same.

79. Typicality (Rule 23(a)(3)). Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all Class members, is subject to the Five-Year Eligibility Rule. Plaintiff, like all members of the Class, has been damaged by Defendants' misconduct in the very same way as the members of the Class. Further, the factual bases of Defendant's misconduct are common to all members of the Class and represent a common thread of misconduct resulting in injury to all members of the Class.

80. Adequacy (Rule 23(a)(4)). Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with, and not antagonistic to, those of the other Class members. Plaintiff has retained counsel experienced in class action litigation and they intend to prosecute this action vigorously. The interests of the members of the Class will be fairly and adequately protected by Plaintiff and his counsel. Neither Plaintiff nor his counsel has any interest adverse to the Class.

81. Superiority (Rule 23(b)(3)). A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Class treatment will conserve judicial resources, avoid inconsistent adjudications, and present no unusual manageability difficulties, as liability turns on Defendant's uniform association-wide adoption and enforcement of a single rule applied identically to every Class member, and Class members are identifiable from Defendant's Transfer Portal and eligibility records. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also represents a potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

82. Injunctive Relief (Rule 23(b)(2)). Defendants have acted or refused to act on grounds that apply generally to the Classes so that final injunctive and declaratory relief is appropriate respecting the Class as a whole.

## CAUSES OF ACTION

### COUNT I: Violation of the Sherman Act – 15 U.S.C. § 1

### Unreasonable Restraint of Trade

### (Per Se or Rule of Reason or Quasi Rule of Reason)

83. Plaintiff realleges and incorporates by reference each and every allegation set forth above as though fully set forth herein.

84. Section One of the Sherman Act prohibits contracts, combinations, and conspiracies that unreasonably restrain trade or commerce within interstate commerce. This Court is invested with jurisdiction to restrain and enjoin violators of the Sherman Act.

85. Here, the anticompetitive effects of the NCAA's decision to foreclose certain student-athletes from the modern intercollegiate athletics market far outweigh any procompetitive benefits. Eligibility is a prerequisite for student-athletes both receiving athletic scholarships and earning NIL and other compensation. Therefore, rules that restrict who can play are inextricably tied to an athlete's academic and economic opportunities—both those attained merely by competing in college, such as NIL compensation, and those that accrue over a lifetime from earning advanced degrees during a fifth year of competition. A student-athlete who is declared ineligible by the NCAA is categorically excluded from the modern intercollegiate athletic market and unable to receive those economic opportunities.

86. The NCAA's Five-Year Eligibility Rule is an arbitrary, capricious, and unreasonable restraint on trade under the Sherman Act. There is no meaningful difference between Plaintiff and the Class, on the one hand, and those who are afforded five years of eligibility by the implementation of the Five-Year Eligibility Rule. The NCAA

indicates as much by allowing athletes to claim the eligibility afforded to them under the most favorable interpretation of either the old rules or the new rule—except for the Class.

87. As a result, the NCAA's Five-Year Eligibility Rule in the nationwide market for student-athletes in the Transfer Portal looking to transfer to Division I schools constitutes an unreasonable restraint on trade. Specifically, the rule produces anticompetitive effects, including but not limited to reduced labor supply, diminished quality of competition, exclusion of athletes due to numerous circumstances beyond their control, and foreclosure of a college athlete's academic, scholarship, revenue sharing, and NIL opportunities tied to eligibility.

88. Courts have consistently found that the NCAA's procompetitive justifications for its eligibility rules are applied inconsistently and undermine any argument that they exceed the devastating anticompetitive effects to college athletes, universities, and consumers. The arbitrary design of the new Five-Year Eligibility Rule, the inflexibility, the barriers to competition erected, and the capricious choices made by the NCAA both in limiting exemptions and in categorically depriving virtually all Class of 2022 high school graduates, but no other class of graduates, of a fifth year of competition undermine the NCAA's procompetitive justifications even more. As a result, the NCAA can no longer plausibly invoke these supposed justifications to enforce the Five-Year Eligibility Rule.

89. Less restrictive alternatives exist within the NCAA's own bylaws. As noted before, the NCAA is already giving athletes who may have different eligibility formulations under the old and new rules the option to apply the rule that is most favorable to the athlete. The NCAA can do so here by granting the same fifth year of competition to class members who elect to return to campus.

90. NCAA exercises direct market power evidenced by its ability to foreclose participation in Division I sports, and the Transfer Portal.

91. Alternatively, a relevant antitrust market, the geographic dimension of which is the United States, and the "product" dimension of which is the Division I sports labor

market. Division I sports is a unique labor market with identifiable boundaries informed by commercial realities, and includes student-athletes in the NCAA's Transfer Portal. No reasonable product/labor substitutes exist. The NCAA exercises monopsony power over the relevant antitrust market evidenced by, e.g., its market share, its direct control over labor, and by its adoption and implementation of Five-Year Eligibility Rule in such a way that completely forecloses Plaintiff and the Class from transferring to and competing for a Division I school in one's fifth year.

92. Plaintiff and the Class have been injured and suffered antitrust injury by the NCAA's anticompetitive conduct, including but not limited to by being foreclosed from the opportunity to play a fifth season and from the scholarship and/or NIL money that such a season could bring. NCAA's conduct as alleged herein has also injured competition in the ways and market described above.

**COUNT II: Breach of Contract; Third-Party Beneficiary**

**(Obligation to provide equal opportunity to compete to all athletes)**

93. Plaintiff realleges and incorporates by reference each and every allegation set forth above as though fully set forth herein.

94. The NCAA Constitution and Bylaws constitute a binding contract between the NCAA and its member institutions across the United States.

95. The NCAA determines the eligibility of any college athlete to compete in NCAA Division I, Division II, and Division III sports.

96. Under any interpretation of applicable state law, Plaintiff and the Class are intended third-party beneficiaries of the contractual relationship between the NCAA and their respective member institutions, and not merely incidental beneficiaries of that relationship. As intended third-party beneficiaries, Plaintiff and the Class are entitled to enforce the NCAA's obligations under the NCAA Constitution and Bylaws.

97. The NCAA breached its obligations to Plaintiff and the Class by adopting and implementing the Five-Year Eligibility Rule as described herein, thus excluding the former from the opportunity for an additional season which other student-athletes are

receiving. This exclusion is inconsistent with the reasonable expectations by Plaintiff and the Class of fairness and equity of opportunity between student-athletes who are third party beneficiaries of (and subject to the enforcement of) the NCAA Constitution and Bylaws.

98. Plaintiff and the Class have been injured by the NCAA's breach of contract, including by including but not limited to by being foreclosed from the opportunity to play a fifth season and from the scholarship and/or NIL money that such a season could bring.

## COUNT III: Declaratory Judgment

99. Plaintiff realleges and incorporates by reference each and every allegation set forth above as though fully set forth herein.

100. Plaintiff seeks a declaration that the NCAA's enforcement of the Five-Year Eligibility Rule is unlawful and unenforceable under the Sherman Act and violates Plaintiff's and the Class's rights.

101. A real controversy exists because the resolution of this dispute will potentially confer rights upon Plaintiff and the Class.

102. The dispute is justiciable because Plaintiff and the Class are suffering harm based on the NCAA's enforcement of the Five-Year Eligibility Rule against them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all members of the proposed Classes, respectfully requests the Court grant the following relief against Defendants:

a. For an order certifying the Class pursuant to Federal Rule of Civil Procedure 23, and naming Plaintiff as Class Representative and his attorneys as Class Counsel to represent the members of the Class;

b. For an order declaring that Defendant's conduct violates the laws and principles referenced herein;

c. For an injunction similar to that in *Wisne v. NCAA* that enjoins Defendant from enforcing the Five-Year Eligibility Rule against Plaintiff, the Class, and the teams, or enforcing roster limits or other rules that would prevent Plaintiff and the Class from playing in the 2026-2027 season, or enforcing against Plaintiff and the Class a cap on compensation limits otherwise laid out in the settlement stemming from the *House v. NCAA* and similar litigation;

d. For actual damages in amounts to be determined by the Court and/or jury;

e. For treble damages pursuant to 15 U.S.C. § 15;

f. For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit;

g. For prejudgment interest and post-judgment on all amounts awarded;

h. For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all claims and causes of action so triable.

DATED: August 18, 2026

Respectfully submitted,

By: */s/Peter J. Farnese*

Peter J. Farnese (SBN 251204)

FARNESE P.C.
2555 Townsgate Rd., Suite 200
Westlake Village, CA 91361
Telephone: 310-356-4668
Email: pjf@farneselaw.com

HONIK LLC
Ruben Honik*
David J. Stanoch*
1515 Market St., Suite 1100
Philadelphia, PA 19102
Telephone: 267-435-1300
Email: ruben@honiklaw.com
Email: david@honiklaw.com

MORITT HOCK & HAMROFF LLP
Daniel Lust*
Lauren Bernstein*

lbernstein@moritthock.com
400 Garden City Plaza
Garden City, NY 11530
Telephone: 516-873-2000
Email: dlust@moritthock.com

* *Pro hac vice application to be filed*

Attorneys for Plaintiff and
the Proposed Class